UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

---

File No.  12-cv-1986 (TNL)

MARY BETH HAYEK,

        Plaintiff,                        **MEMORANDUM AND ORDER**

   v.

CAROLYN W. COLVIN,[1]
ACTING COMMISSIONER OF SOCIAL SECURITY

        Defendant.

---

David L. Christianson, Esq., 1201 Marquette Ave., Suite 110, Minneapolis, MN 55403, and Thomas A. Krause, Esq., 6611 University Ave., Suite 200, Des Moines, Iowa, 50324, for Plaintiff.

Ana H. Voss, Assistant United States Attorney, 300 South Fourth Street, Suite 600, Minneapolis, MN 55414, for Defendant.

---

TONY N. LEUNG, United States Magistrate Judge.

     Plaintiff Mary Beth Hayek ("Hayek") disputes the Commissioner's denial of her application for disability insurance benefits ("DIB").  Judicial review in the United States District Court for the District of Minnesota is proper under 42 U.S.C. § 405.  The parties consented to jurisdiction by the undersigned United States Magistrate Judge, pursuant to 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73, to conduct any and all

---

[1] Carolyn W. Colvin became Acting Commissioner of Social Security on February 14, 2013.  She is substituted as the defendant pursuant to Fed. Riv. P. 25(d).

proceedings in this case.  (Doc. Nos. 7, 8.)  This matter is before the Court on the parties' cross motions for summary judgment (Doc. Nos. 15, 22.)  For the reasons discussed below, Plaintiff's motion for summary judgment is granted for remand (Doc. No. 15), and Defendant's motion for summary judgment is denied (Doc. No. 22).

## I.    BACKGROUND

### A.    Procedural History

Hayek was 46-years old when she filed her application for DIB on November 5, 2006, and she alleges a disability onset date of April 1, 2006.  (Tr. 9, 189-91, 239.)[2] Hayek's application was denied initially and upon reconsideration.  (Tr. 103-07, 112-14.) She requested a hearing, and a hearing was held on June 16, 2009, before Administrative Law Judge Roger W. Thomas ("ALJ").  (Tr. 115-17, Supp. Tr. 1026-62.) On July 17, 2009, the ALJ denied Hayek's claim.  (Tr. 83-97.)  Hayek requested review of the ALJ's decision by the Appeals Council.  (Tr. 145-146.)  The Appeals Council granted review and, on March 3, 2011, remanded to the ALJ for further proceedings, and to issue a new decision.  (Tr. 98-102.)

A second hearing was held before ALJ Thomas on May 17, 2011.  (Tr. 34-80.) The ALJ issued a decision denying Hayek's claim on May 20, 2011.  (Tr. 5-24.)  The ALJ concluded that Hayek was capable of performing jobs such as optical assembly, electronics assembly, bench assembly and housekeeping/cleaner, which exist in significant numbers in the national economy.  (Tr. 23-24.)  Therefore, the ALJ found Hayek was not under a disability, as defined in the Social Security Act, from April 1, 2006 through the date of the ALJ's decision.  (Tr. 24.)

---

[2] The Court uses the abbreviation "Tr." to reference the Administrative Record, Doc. No. 4, and "Supp. Tr." to refer to the Supplemental Administrative Record, Doc. No. 5.

Hayek requested review of the ALJ's decision by the Appeals Council.   (Tr. 30-33.)   The Appeals Council denied review on June 14, 2012 (Tr. 1-5), and the ALJ's decision became the final decision of the Commissioner of Social Security.   *See Ford v. Astrue*, 518 F.3d 979, 981 (8th Cir. 2008) (Appeals Council's denial of review made the ALJ's decision the final decision of the Commissioner).   Hayek initiated the present action for judicial review on August 14, 2012.

### B.      Employment History

Hayek's past employment includes video rental store sales from June 1992 through April 2001, receptionist from April 2001 through September 2001, manager of a video rental store from September 2001 through November 2005, and intake and clerical work for a police impound lot from November 2005 through April 2006.   (Tr. 254.)   Hayek left the video rental job in 2005 because she disliked it.   (Tr. 65, 403, 489.) Her next job ended in April 2006 because it was seasonal.   (*Id.*)

### C.      Medical Records

#### 1.      Before the Alleged Onset Date

Hayek was diagnosed with fibromyalgia in 2000.   (Tr. 340.)   Her medical record reflects methadone overdoses in 2002 and 2003, as well as positive urine screenings for methamphetamines and PCP in 2002.   (*Id.*)   While it was recommended that Hayek complete a chemical-dependency evaluation, there is no evidence in the record that such an evaluation occurred.   (Tr. 340-41.)   Upon changing providers in July 2004, Hayek was prescribed hydrocodone.   (Tr. 341.)   Her medical record also includes referrals to pain clinics, but no evidence that she actually attended.   (*Id.*)

In October 2005, Hayek transferred her care within the United Family Practice Health Center ("United Family") to Dr. Laurie Radovsky.  (Tr. 340-41.)  Hayek had only been to United Family three times in 2005, and she said she was not currently on any narcotics.  (Tr. 341.)  She had pain in her neck, shoulders, knees, lower back and right chest wall.  (Tr. 340.)  She had been on many medications with no relief, and she had tried other medications that caused side effects.  (Tr. 341.)  She complained of a fibromyalgia flare with significantly decreased sleep, and she was looking for new ways of coping with her pain and becoming functional.  (*Id.*)  Hayek was not considered to be a candidate for back surgery because she did not have evidence of nerve impingement.  (*Id.*)  She had already tried the following treatments for pain:  acupuncture, chiropractic treatment, hypnosis, homeopathy, physical therapy, exercise, massage, nerve blocks, trigger point injections, steroid injections, counseling and diet.  (*Id.*)

On examination, Hayek appeared relatively comfortable while sitting, but her gait was slow with some mild discomfort.  (*Id.*)  Dr. Radovsky diagnosed fibromyalgia, chronic pain and history of chemical dependency, with evidence of chemical dependency treatment in 1980 and alcoholism treatment.  (Tr. 340-41.)  Hayek did not believe she had a chemical dependency problem.  (Tr. 341.)

Dr. Radovsky referred Hayek to Dr. Alfonso Morales at Central Medical Clinic for a second opinion on fibromyalgia, and Dr. Morales evaluated Hayek on November 11, 2005.  (Tr. 415.)  Dr. Morales noted Hayek had a history of alcohol abuse in her early 20s, but had been sober for the last ten years, and she also had a history of opiate abuse.  (*Id.*)  On examination, Hayek was in no acute distress, but she was severely deconditioned.  (Tr. 416.)  She had restricted range of motion in the hips and cervical

4

spine, and tenderness in the thoracic and lumbar areas. (*Id.*) She was neurologically intact. (Tr. 416-17.) Strength, sensation and reflexes in her extremities were normal. (Tr. 417.) Her deconditioning affected her trunk balance and gait. (*Id.*) Dr. Morales diagnosed chronic pain syndrome, fibromyalgia, history of misuse of opioids and chemical coping, and history of substance abuse. (*Id.*) He made changes to Hayek's medications. (*Id.*)

On November 25, 2005, Hayek complained of headaches, neck pain, dizziness and imbalance. (Tr. 411.) Dr. Morales agreed to prescribe OxyContin, dependent on her exercising, engaging in cognitive behavioral therapy, and quitting smoking. (Tr. 412.) In December 2005, Hayek's husband lost his job, and they lost their insurance. (*Id.*) Dr. Morales noted Hayek was working, her fibromyalgia was stable, and she was becoming more active and functional. (Tr. 407.) Hayek had trigger point injections in the cervical-thoracic area with some relief. (Tr. 396, 399.)

On February 27, 2006, Dr. Morales wanted Hayek to taper off OxyContin, and Hayek agreed. (Tr. 393.) Her Cymbalta would be increased. (*Id.*) Hayek then saw Dr. Radovsky on March 13, 2006. (Tr. 335.) She reported that trigger point injections relieved her pain 40% but relief only lasted a little more than a week. (*Id.*) The Cymbalta was not effective. (*Id.*) Hayek was tearful and frustrated from pain. (*Id.*) She was also worried because her seasonal job ended. (*Id.*) Dr. Radovsky noted that multiple medications had not been helpful for Hayek or had caused side effects in the past. (*Id.*) She had already been through treatment at the Abbott Northwestern fibromyalgia program, and the HealthEast Pain Clinic for fibromyalgia. (*Id.*) Hayek had not seen her therapist for some time. (*Id.*) Dr. Radovsky noted Hayek had an

extremely low pain threshold due to her fibromyalgia.  (Tr. 336.)  She referred Hayek to Rheumatology Nurse Associates for fibromyalgia treatment.  (*Id.*)

On March 27, 2006, Hayek followed up with Dr. Morales.  (Tr. 390.)  Dr. Morales was trying to wean Hayek from OxyContin and treat her with diet and exercise.  (*Id.*)  Dr. Morales noted that Hayek required psychotherapy and chemical evaluations on a frequent basis.  (*Id.*)  Hayek agreed to reduce her OxyContin to twice a day, and to start pool therapy three times per week.  (*Id.*)

### 2.    After the Alleged Onset Date

On May 2, 2006, Hayek obtained a refill of her prescriptions and stated that she would be changing providers for insurance reasons.  (Tr. 387.)  Hayek was subsequently evaluated by Nurse Greta Abruzzese at Rheumatology Nurse Associates on May 9, 2006.  (Tr. 336, 359.)  Hayek reported having pain everywhere, chronic fatigue and stiffness, with symptoms present for more than ten years.  (Tr. 359.)  Hayek recently became unemployed from seasonal work, but hoped to return next season. (*Id.*)  When asked to describe her activities of daily living, Hayek stated that she and her husband shared grocery shopping and housework, but she did the cooking.  (*Id.*)  She forced herself to walk 5-7 days a week for 45-60 minutes.  (*Id.*)  She used a hot bath at home to relax and stretch.  (*Id.*)  She had memory and concentration problems when in pain.  (*Id.*)  She only slept five hours at night and did not feel refreshed.  (*Id.*)

On examination, Hayek's gait and station were normal, and she had crepitus in both knees.  (Tr. 360.)  She had fair range of motion, without joint tenderness or swelling.  (*Id.*)  She had muscle tightness in the upper trapezius muscles but no spasms.  (*Id.*)  She had seventeen out of eighteen tender points.  (Tr. 360.)

On May 14, 2006, Hayek returned to Dr. Radovsky, appearing more animated and less depressed and anxious than on previous visits. (Tr. 334.) She was frustrated, however, with her search for employment. (*Id.*) Dr. Radovsky referred Hayek to an orthopedist for management of knee pain, noting probable arthritis. (Tr. 334.) Dr. Radovsky planned to wean Hayek off narcotics. (*Id.*)

Hayek followed up with Abruzzese later that month. (Tr. 363.) She asked for oxycodone, but Abruzzese declined and recommended using heat, ice, acupuncture and stretching. (*Id.*) Abruzzese also recommended walking only fifteen minutes, five times per week. (*Id.*)

Hayek next saw Abruzzese on June 16, 2006. (Tr. 364.) Hayek reported financial stress because her husband was out of work due to carpal tunnel surgery. (*Id.*) Hayek was looking for a job, although she did not believe she could physically handle working. (*Id.*) She tried walking ten or fifteen minutes once or twice a day, which was helpful for her leg pain and swelling. (*Id.*) Abruzzese provided Hayek with a handout entitled "Fibromyalgia and Employment." (*Id.*) She urged Hayek to consider part-time work "and to evaluate potential jobs in light of the concerns raised on the handout: repetitive movements, nonergonomic body positioning, lifting and carrying, pushing heavy objects, and long hours or rotating shifts." (*Id.*)

When Hayek saw Dr. Radovsky on July 10, 2006, she was suffering financial stress and became tearful during the conversation. (Tr. 333.) After stopping her pain medications for a few days, she had a tremendous pain flare-up. (*Id.*) She was trying to exercise by walking her dog twice daily. (*Id.*) On examination, she did not appear to be in extreme discomfort. (*Id.*) She was given a toxicology screen, which was positive

for cocaine and alprazolam (Xanax).  (*Id.*)   Hayek admitted taking someone else's Xanax in order to sleep but denied using cocaine.  (*Id.*)   Dr. Radovsky explained that she could not prescribe any more narcotics.  (*Id.*)

Hayek was evaluated by Dr. Michael Espeland at Midway Pain Center on September 13, 2006.  (Tr. 471-72.)   Her most prominent pain at the time was under the right breast; intercostal nerve injections had been helpful for this in the past, with relief lasting several months.  (Tr. 471.)   She was working 20-30 hours per week doing computer work.  (Tr. 472.) On examination, she was alert and oriented, with intact memory.  (*Id.*)   She did not exhibit overt pain behaviors.  (*Id.*)   Her strength was normal but some range of motion exercises caused pain, and she was diffusely tender in the trapezius and cervical musculature.  (*Id.*)   Dr. Espeland referred Hayek for physical therapy.  (Tr. 473.)

A week later, Hayek returned to Dr. Espeland, complaining of severe pain and frequent fibromyalgia flares.  (Tr. 468.)   On examination, she arose from sitting to standing with slight difficulty and walked with an antalgic gait.  (*Id.*)   She was alert and oriented, and in no apparent distress.  (*Id.*)   Dr. Espeland instructed Hayek to treat her fibromyalgia and chronic pain with physical therapy, muscle relaxants, anti-inflammatories, and adjunctive medication like Cymbalta.  (*Id.*)   Hayek felt she needed oxycodone for flare-ups, and Dr. Espeland explained using opioids for flare-ups was inadvisable.  (Tr. 469.)   Hayek refused a muscle relaxant because she had tried it before without benefit.  (*Id.*)   She was amenable to diet changes.  (*Id.*)   Dr. Espeland administered a nerve block for Hayek's chest-wall pain.  (Tr. 470.)   Approximately 30 minutes after the administration of the nerve block, Hayek reported 30% relief.  (*Id.*)

Dr. Mark Agre at IMPACT–Physical Medicine and Aquatic Center evaluated Hayek on October 13, 2006. (Tr. 460-62.) Hayek told Dr. Agre that she hoped to return to her seasonal job in November. (Tr. 460.) Her pain increased with most postures and activities, but she felt better lying on her back or walking. (Tr. 461.) She reported that she could sit for ten minutes, stand for fifteen minutes, and walk fifteen blocks. (*Id.*) On examination, she could walk freely but had pain with transitioning. (*Id.*) She had diffuse deconditioning affecting range of motion. (*Id.*) Dr. Agre recommended starting in the therapeutic pool. (*Id.*) Hayek attended therapy from October 13 through November 21, 2006. (Tr. 447-56.)

Contrary to her report of 30% relief post-injection, Hayek reported that the nerve block did not provide any improvement when she saw Dr. Espeland on October 19, 2006. (Tr. 466.) She had just taken her last dose of oxycodone, and felt it was helpful in allowing her to carry out her activities of daily living. (*Id.*) She used heat and rest to treat pain flare-ups. (*Id.*) On examination, she did not exhibit overt pain behavior, and she did not appear sedated or drowsy. (*Id.*) Dr. Espeland prescribed oxycodone upon agreement that Hayek would not receive narcotics from any other provider and would undergo random drug screens. (*Id.*) On November 6, 2006, Hayek reported warm pool therapy helped her fibromyalgia, and oxycodone took the edge off her pain. (Tr. 464.) She continued to have difficulty sleeping. (*Id.*) On examination, she appeared somewhat uncomfortable, with guarded movement but steady gait. (*Id.*) Dr. Espeland recommended trigger point injections to treat chest-wall pain. (Tr. 465.)

Hayek underwent a consultative psychological examination with Dr. Alford Karayusuf on December 23, 2006. (Tr. 488-90.) Hayek stated that she had been

depressed ever since she was diagnosed with fibromyalgia years earlier. (Tr. 489.) She was taking Cymbalta, without improvement in her depression. (*Id.*) She was in constant pain and cried often, with recurring suicidal thoughts. (*Id.*) Her last job was at an impound lot, where cars were impounded during snow emergencies. (*Id.*) She had not worked this year because there had not been any snow. (*Id.*)

Hayek described her daily activities. (*Id.*) She lived with her husband and 13-year-old daughter. (*Id.*) She had two other children, aged 28 and 26, and she had contact with them every other day. (*Id.*) Hayek bathed once a week. (*Id.*) She did her cooking in the microwave, and her husband did the grocery shopping. (*Id.*) She vacuumed once a month, and washed dishes three times a week. (*Id.*) Her husband did the laundry. (*Id.*) She watched television three hours per day, and had no other hobbies or social activities other than talking to her siblings on the phone. (Tr. 490.)

Dr. Karayusuf estimated Hayek's IQ to be in the mid-80s. (*Id.*) She appeared sad, tired, pale and tense, and she looked physically ill. (*Id.*) Dr. Karayusuf diagnosed depression. (*Id.*) Based on her psychiatric condition, he opined that Hayek would be restricted to work with brief and superficial interactions with co-workers, supervisors and the public, performing simple, routine, repetitive, concrete, tangible tasks. (Tr. 490-91.)

In February 2007, Hayek had right hip, knee and foot pain. (Tr. 512.) Examination revealed some crepitus in the knees, and slight pain with range of motion of the hips. (*Id.*) Knee x-rays showed minimal arthritic changes, and pelvic x-rays showed no hip degeneration. (*Id.*) Dr. Jay Johnson at Capitol Orthopedics, Ltd. diagnosed hip pain from greater trochanteric bursitis, and knee pain from patellofemoral malalignment due to weakness. (Tr. 513.) Hayek had an MRI of her lumbar spine,

revealing mild disc dehydration changes at L5-S1 with mild annular bulge, and mild predominantly left-sided facet degeneration at L5-S1.  (Tr. 514.)

On July 19, 2007, Dr. Radovsky completed a questionnaire regarding Hayek's work-related limitations arising from her impairments of fibromyalgia, depression, and chronic neck pain.[3]  (Tr. 801.)  Hayek's symptoms included multiple tender points, nonrestorative sleep, chronic fatigue, morning stiffness and muscle weakness, headaches, subjective swelling, irritable bowel syndrome, vestibular dysfunction, TMJ, numbness and tingling, Raynaud's phenomenon, dysmenorrhea, breathlessness, anxiety, depression, hypothyroidism, and carpal tunnel syndrome. (*Id.*) Dr. Radovsky opined that Hayek was incapable of even low-stress jobs.  (Tr. 802.)  She opined that Hayek could walk five blocks without pain, stand for half an hour, sit and stand less than two hours in a workday, and she needed hourly breaks to lie down for five to ten minutes.  (Tr. 803.)  Furthermore, Hayek could rarely carry objects weighing less than ten pounds, rarely stoop or climb stairs, never look up, and rarely look down, turn her head or hold her head in a static position, and she could use her hands for manipulation only 5% of the workday.  (*Id.*)  Finally, Dr. Radovsky opined that Hayek would probably miss more than four days of work per month.  (Tr. 804.)

Hayek underwent a cervical radiofrequency neurotomy[4] on August 9, 2007, with good relief.  (Tr. 537.)  When her symptoms returned in May 2008, she repeated the

---

[3] Dr. Radovsky also cited Hayek's diagnoses of COPD, panic disorder, and borderline hypothyroidism, which were made long before Hayek's alleged disability onset date.

[4] "Radiofrequency neurotomy is a procedure to reduce back and neck pain.  It uses heat generated by radio waves to damage specific nerves and temporarily interfere with their ability to transmit pain signals." Radiofrequency Neurotomy, Mayo Clinic, http://www.mayoclinic.com/health/radiofrequency-neurotomy/MY00947.  The terms radiofrequency ablation and radiofrequency neurotomy are used interchangeably.  Ray M. Baker, M.D., *Radiofrequency Neurotomy for Facet and Sacroiliac Joint Pain*, Spine-Health, http://www.spine-health.com/treatment/injections/radiofrequency-neurotomy-facet-and-sacroiliac-joint-pain.

procedure.  (Tr. 595.)  In February 2008, Hayek's pain was moderate but constant.  (Tr. 540.)  She also had to stop taking Cymbalta because it was not covered by insurance.  (*Id.*)  Her cervical range of motion was restricted in all ranges due to pain.  (*Id.*)  She was able to get up from sitting to standing without difficulty and walked with a normal gait.  (*Id.*)  She was referred for psychological treatment.  (Tr. 541.)  The following week, Hayek saw Dr. Espeland for trigger point injections to her thoracic spine.  (Tr. 539.)

On March 24, 2008, Hayek was hospitalized after overdosing on pain medication.  (Tr. 688-91.)   Hayek's husband reported that she occasionally went on weekend prescription opiate and/or street drug binges and was comatose for the weekend.  (Tr. 691.)  She was comatose one or two weekends per month.  (Tr. 708.)  Hayek's husband and daughter felt she had a serious problem with pain medications and wanted her to get help.  (Tr. 691.)  She quit drinking five years ago, but her husband believed she was getting pain medications off the street.  (Tr. 692.)  Testing also revealed she had liver abnormalities consistent with alcoholic hepatitis.[5]  (Tr. 696.)  The admitting physician stated, "[c]learly this patient is recurrently flirting with polypharmacy overdose which eventually will be fatal due to aspiration pneumonia or other cause unless there is intervention and reduction of her med supply from PMD and others.  Her concurrent use of ETOH is scary."  (Tr. 697.)

Hayek was readmitted to the hospital on April 6, 2008, for opiate overdose and acute renal failure.[6]  (Tr. 752.)  While hospitalized, she was diagnosed with coronary

---

[5] If a person with alcoholic hepatitis abstains from alcohol for some months, alcoholic hepatitis, an inflammation of the liver, usually is reversible.  In some cases abstention has to go on for years.  *What is Alcoholic Liver Disease?* Medical News Today, http://www.medicalnewstoday.com/articles/215638.php (last updated April 25, 2013).

[6] When prescribing Percocet, precaution should be taken in patients with liver disease.  Severe liver failure has occurred in chronic alcoholics following therapeutic doses of Percocet.  *Percocet*, Daily Med, http://dailymed.nlm.nih.gov/dailymed/lookup.cfm?setid=3af57f54-117e-43fc-b0ae-21ef772d854e.

artery disease.  (*Id.*)  A cardiac stress test revealed findings consistent with infarction. (Tr. 777.)  Hayek was discharged on April 12, 2008.  (Tr. 752.)

Hayek was admitted to United Hospital on April 23, 2008, for evaluation of shortness of breath.  (Tr. 626-29.)  She was discharged two days later with diagnoses of pneumonia, chronic obstructive pulmonary disease, mild arteriosclerotic heart disease, and secondary cardiomyopathy.  (Tr. 626.)  Hayek's pneumonia was doing better at the end of the month, but Hayek had chronic pain and severe insomnia from fibromyalgia. (Tr. 564.)  Dr. Radovsky referred Hayek for further evaluation of her insomnia in order to rule out obstructive sleep apnea and determine whether narcotic use was contributing to her sleep problems.  (*Id.*)

Hayek returned to Dr. Espeland for repeat radiofrequency neurotomy in May 2008, as the effects from her last treatment for cervical pain wore off.  (Tr. 536-37.) Later that month, Hayek was concerned that she had extreme pain, despite narcotic and other medications she was taking.  (Tr. 563.)  Dr. Radovsky noted that the medications had potential severe side effects such as respiratory depression, which Hayek narrowly escaped several times by unintentional overdose, and Hayek did not have a great quality of life on the medications.  (*Id.*)  Dr. Radovsky had reached the boundaries for what conventional medicine could do for Hayek's pain.  (*Id.*)  She recommended looking for alternatives, such as an anti-inflammatory diet.  (*Id.*)

Hayek saw Dr. Espeland on June 25, 2008.  (Tr. 533.)  Dr. Radovsky had notified Dr. Espeland that Hayek was hospitalized in April for overdose, causing heart failure due to drug toxicity.  (*Id.*)  Dr. Espeland had been unaware Hayek was hospitalized for this three times in the past.  (*Id.*)  Her insurance would not pay for psychological care or

a chronic pain program.  (*Id.*)   Her examination was normal, with the exception of exquisite tenderness in the cervical, trapezius, thoracic and lumbar areas.  (Tr. 534.) She would begin a tapered dose of OxyContin.  (*Id.*)

In August 2008, Hayek reported constant pain in her neck and shoulders with terrible headaches.  (Tr. 529.)  She also had a low back ache since taking her last dose of OxyContin.  (*Id.*)  Her last radiofrequency neurotomy was no longer helping.  (*Id.*)  On examination, she had difficulty arising from a sitting to standing position but fairly normal gait.  (*Id.*)   Dr. Espeland would not restart opioid treatment due to Hayek's past overdoses.  (*Id.*)   He recommended walking, heat, ice, massage, and psychological treatment.  (Tr. 530.)

Hayek was evaluated by Dr. Kenneth Britton at Britton Pain Center ("Britton Center") on January 22, 2010.  (Tr. 809.)  Dr. Britton noted that Hayek's trigger point injections had stopped when her husband lost his insurance.  (*Id.*)  Hayek complained of constant pain, malaise, night sweats, headache, muscle aches, joint stiffness, decreased concentration, anxiety, depression and sleep disturbance.  (Tr. 809-10.)  On examination, she was obese, and she had eighteen out of eighteen positive trigger points.   (Tr. 810-11.)   Dr. Britton diagnosed fibromyalgia, chronic pain syndrome, adjustment disorder with anxiety and depressed mood; he also administered trigger-point injections and prescribed Lyrica.  (*Id.*)   In February and March, Hayek's condition was unchanged, and she asked Dr. Britton to prescribe OxyContin, reporting it had been some time since she used it on a regular basis.  (Tr. 813-17.)   He prescribed oxycodone as needed for more severe pain.  (Tr. 815.)

14

In April 2010, Hayek reported burning pain in her feet.  (Tr. 818.)  She was not sure Lyrica was helping.  (*Id.*)  In May, Dr. Britton increased Hayek's dosage of Percocet (acetaminophen and oxycodone).  (Tr. 823.)  In June, Hayek reported that she discontinued Lyrica, and was no worse without it.  (Tr. 826.)  Dr. Britton added OxyContin for longer acting pain relief.  (Tr. 828.)  He noted that Hayek's drug screen showed Xanax and Soma, which she said was from old prescriptions, and she did not use them regularly.  (*Id.*)  In July, Dr. Britton referred Hayek for injections to control thoracic radiculopathy or intercostal nerve irritation.  (Tr. 831-32.)

Dr. Sherif Roushdy at Advanced Spine Associates evaluated Hayek on August 11, 2010.  (Tr. 867.)  Hayek suffered mid-thoracic pain with right intercostal neuralgia since her daughter was born fifteen years ago.  (*Id.*)  Hayek reported that she was dramatically worse the last two years.  (*Id.*)  Many treatments for fibromyalgia had been unsuccessful.  (*Id.*)  She was taking Celexa for depression.  (*Id.*)  Her activities of daily living had markedly declined over the last few years.  (*Id.*)  Examination of her spine revealed multiple trigger points, and some evidence of a radicular component along the T8-T9 nerve roots.  (Tr. 868.)  Dr. Roushdy diagnosed intercostal neuralgia/thoracic radiculopathy, chronic pain syndrome, and fibromyalgia.  (*Id.*)  Hayek's thoracic MRI revealed exaggerated thoracic kyphosis with slight loss of vertebral body height and moderate disc herniation at T7-8.  (Tr. 798.)  Dr. Roushdy treated Hayek with thoracic medial nerve block injections in October and December 2010.  (Tr. 870-73.)

On September 27, 2010, Hayek told Physician Assistant Mark Winkler[7] at the Britton Center that her pain was about the same, but she was sleeping better.  (Tr. 839.)

---

[7] Winkler's title is not identified in the medical records.  According to the Britton Center website, Winkler is a physician assistant.  http://www.brittoncenter.com/prov_physicianasst.cfm.

One month later, Winkler prescribed Tizanidine to treat Hayek's muscle spasms. (Tr. 844.)  On November 24, 2010, Hayek told Winkler that her long acting pain medication was not lasting long enough. (Tr. 845.)  Winkler did not increase her medications. (Tr. 848.)  In December 2010, her symptoms were controlled. (Tr. 849.)  She underwent radiofrequency ablation at T7-T10 of the thoracic spine on December 29, 2010. (Tr. 874.)  She also requested evaluation of neck pain. (*Id.*)

On January 19, 2011, Hayek told Winkler she could not do certain exercises because she could not raise her arms, and she demonstrated this to him. (Tr. 855.)  The next month, her pain symptoms were uncontrolled. (Tr. 858.)  Her treatment was unchanged, but she was referred for a cervical MRI. (Tr. 861.)  The MRI showed mild disc bulging at C2-3, without protrusion. (Tr. 865.)  In March 2011, Hayek requested stronger pain medication. (Tr. 890.)  Winkler provided trigger-point injections and ordered a drug screen. (Tr. 893-94.)

On April 8, 2011, Hayek's husband called 9-1-1 because Hayek overdosed on oxycodone. (Tr. 946-47.)  Her husband told emergency medical personnel that Hayek "heavily hits the Methadone," which she was out of, so she took oxycodone. (Tr. 947.)  He indicated that Hayek bought methadone from a friend. (*Id.*)  Hayek's husband said that Hayek had also taken Xanax belonging to a friend, and Hayek's last overdose had occurred in 2008. (Tr. 949.)  Hayek was discharged from the hospital the next day. (Tr. 951.)

Later that month, Hayek was admitted to United Hospital for evaluation of chest pain. (Tr. 980-87.)  Her depression and anxiety were also worsening. (Tr. 984.)  Her chest pain was relieved with nitroglycerin. (Tr. 986.)

### D.   Function Reports

Hayek completed a function report for the Social Security Administration on November 16, 2006.  (Tr. 270-77.)  She described a typical day where she walked her daughter to the bus stop, went to pool therapy, walked her dog, and lay down because sitting for more than an hour caused "devastating pain."  (Tr. 270.)  She napped until her daughter came home from school, made a snack, and cooked something in the microwave for dinner.  (*Id.*)  Describing her personal care, Hayek said it was painful to dress herself; she used a hot bath for pain relief; and she washed her hair once a week and shaved every 4-6 months.  (Tr. 271.)  In the morning, her jaw hurt and it was hard to swallow.  (*Id.*)  Her therapist recommended a lift for the toilet and a bar for the bathtub.  (*Id.*)

Hayek usually cooked fast dinners, but made one good meal per week.  (Tr. 272.)  She helped her husband with some housekeeping chores for up to 30 minutes.  (*Id.*)  Once a week, she went grocery shopping for up to an hour.  (Tr. 273.)  The only hobbies she could still do were cooking and reading.  (Tr. 274.)  She talked with her sisters on the phone, and she used a computer for 30 minutes before her back, neck and shoulders were throbbing.  (Tr. 274.)  She no longer enjoyed social activities like family functions, eating out, or going for scenic drives.  (Tr. 275.)  She could only walk three blocks before resting and could only lift 20 pounds.  (*Id.*)  Standing and sitting caused burning pain, and reaching caused pulling in her muscles.  (*Id.*)

Hayek's husband also completed a function report for the Social Security Administration, dated November 12, 2006.  (Tr. 262-69.)  He worked from 7:00 a.m. until 3:30 p.m., and his wife was in bed when he got home.  (Tr. 262.)  He confirmed that she

took her daughter to the bus stop in the morning, and dressing was painful to her.  (Tr. 263.)  Other than using the microwave, she made meals twice a week, and she helped with some household chores a little at a time.  (Tr. 264.)  She had no social life.  (Tr. 266.)

### E.    Hearing Testimony

At the administrative hearing, Hayek's attorney explained there was a gap in the records from 2008 and 2009, when Hayek did not have medical insurance and could not get treatment.   (Tr. 39.)   Hayek then testified about her impairments, pain, and treatment.  She had nerve ablation surgery, but it had not helped her neck, thoracic or lumbar back pain, and her antidepressant was recently increased.  (Tr. 41-42, 44.)  The ALJ asked about notes in Hayek's medical records that read:  "No physical disability, and activities of daily living were normal."  (Tr. 45-46.)  Hayek said she was reporting pain levels of eight or nine out of ten to that physician, contrary to the note of no disability and normal activities.  (*Id.*)  As to her other treatments, injections to her chest wall were effective for about three days, and nerve blocks were also effective for only a few days.  (Tr. 47, 59.)  Hayek had frequent pain flare-ups when she exerted herself. (Tr. 59.)

Hayek said Dr. Radovsky's evaluation in 2007 was accurate at the time, but she later increased her walking exercise at the recommendation of her doctors.  (Tr. 48.)  If she walked a mile, she had to take hot baths for hours.  (*Id.*)  Now, she was lucky to walk four blocks, and she was overweight and out of shape.  (Tr. 49.)  She could groom, dress and feed herself.  (*Id.*)  She only showered twice a week because it was a chore to climb the staircase in her house to the bathroom.  (Tr. 49-50.)  She slept on the

couch downstairs to avoid climbing stairs.   (*Id.*)   In the last year or two, she only prepared one family meal per week because she was too tired and sore.  (Tr. 51.)  She did laundry, but her husband did the folding. (*Id.*)  She slept only three hours at night.  (Tr. 51-52.)  During the day, she took her dog on three short walks.  (Tr. 52.)  She went to the grocery store with her husband on the weekends.  (*Id.*)  Sitting caused muscle spasms, so she lay down most of the day, reading and watching television.  (Tr. 53.)  She drove herself to doctor appointments, except when she had injections and needed a ride.  (*Id.*)

Hayek took nitroglycerin, which caused dizziness and headaches.  (Tr. 54.)  Her fibromyalgia pain was the most severe in her right rib cage, through the back, and into the neck.  (Tr. 55.)  Pain medication made her tired and forgetful.  (*Id.*)  Hayek did not believe she could perform a sitting job because she was on too many medications and had trouble concentrating.  (Tr. 56.)  She also related her difficulty concentrating to a symptom of fibromyalgia called "fibro fog."  (*Id.*)  She would have to lie down seven out of eight hours per day due to muscle spasms.  (*Id.*)  Because she lost track of taking her medication and had overdosed, her husband had to monitor her medication for the last seven or eight months.  (Tr. 58.)  Her pain medications only helped to the extent that she was no longer crying constantly from pain.  (Tr. 60.)

Hayek's husband also testified at the hearing.  (Tr. 62-69.)  He confirmed that Hayek cried often.  (Tr. 62.)  She was in bed all the time.  (*Id.*)  He also explained his comment to emergency medical personnel that his wife "heavily hits the methadone," stating that he meant to convey that his wife uses methadone when she was not getting enough relief from treatment prescribed by doctors.  (Tr. 63-64.)  He confirmed that

Hayek only bathed a couple times per week, did not cook, and just lay down all day. (Tr. 67.)  She used a computer twice a day, but not for long because her neck hurt.  (*Id.*) When she tried to plant bulbs in the garden, he had to help her back into the house ten minutes later.  (Tr. 69.)

Dr. Andrew Steiner testified at the administrative hearing as a medical expert. (Tr. 69-74.)  He testified that he had reviewed Hayek's medical records and identified the medical impairments he found.  (Tr. 70-72.)  In terms of whether Hayek met or equaled a listed impairment, Dr. Steiner testified that the "actual objective findings" of Hayek's conditions "were not great, and not associated with any ongoing neural compromise, and this is primarily, then, a pain case . . . ."  (Tr. 72.)  Dr. Steiner would impose light work restrictions in terms of lifting and time on the feet with occasional overhead work, bending and twisting.  (*Id.*)  Dr. Steiner testified that he recognized fibromyalgia as a diagnosis.  (Tr. 72-73.)  Dr. Steiner believed there were diffuse pain reports in this case "without much in the objective sphere."  (Tr. 74.)  He agreed that chronic pain can interfere with work activities.  (*Id.*)  If chronic pain was severe, Dr. Steiner agreed it could eliminate work activities.  (*Id.*)

Steven Bosch testified at the administrative hearing as a vocational expert.  (Tr. 74-79.)  The ALJ posed the vocational hypothetical question assuming an individual is in the age range of 46 to 51 years; with a high school education; the work history as set out in Bosch's report;[8] the impairments and limitations described by Dr. Steiner; the individual is on medications and has not had any psychiatric hospitalizations; and she is limited to simple instructions, brief, superficial contacts with others in the work setting and work that is simple, routine and repetitive with concrete, tangible tasks.  (Tr. 75-76.)

---

[8] Bosch's Vocational Consultant Case Analysis is at Tr. 327.

Bosch testified that such a person could not perform Hayek's past relevant work.  (Tr. 76.)  There would, however, be other jobs in the region that such a person could perform, including office helper,[9] bench assembly,[10] and housekeeping/cleaner.[11]  (Tr. 77.)

For a second hypothetical question, the ALJ included Dr. Steiner's work restrictions and added a limitation of three to four steps, routine, repetitive tasks and instructions, and with brief, superficial contacts with others.  (Tr. 77.)  Bosch testified the restrictions would eliminate the office helper jobs.  (*Id.*)  The ALJ changed the hypothetical to include sedentary work.  (Tr. 77-78.)  Bosch testified there would be jobs consistent with the hypothetical in optical assembly[12] and electronics assembly.[13]  (Tr. 78.)  Hayek's counsel then posed a hypothetical question, adding a limitation to the ALJ's hypotheticals, limiting grasping and fine manipulation with both hands to 5% of the day.  (Tr. 79.)  Bosch testified none of the jobs would be available.  (*Id.*)  If the person would be absent four days per month, Bosch indicated the jobs would not be available.  (*Id.*)  If the person needed to take regular breaks hourly, the jobs would not be available.  (*Id.*)

## F.    ALJ's Decision

On May 20, 2011, the ALJ made the following findings and conclusions on Hayek's application.

> 1.  The claimant meets the insured status requirements of the Social Security Act through June 30, 2011.

---

[9] DOT Code 239.567-010, with 3,000 jobs in Minnesota.
[10] DOT Code 706.687-010, with 20,000 jobs in Minnesota.
[11] DOT Code 323.687-014, with 5,000 jobs in Minnesota.
[12] DOT Code 713.687-018, with 2,000 jobs in Minnesota.
[13] DOT Code 726.685-066, with 5,000 jobs in Minnesota.

2.  The claimant has not engaged in substantial gainful activity since April 1, 2006, the alleged onset date (20 CFR 404.1571 *et seq.*) . . . .

3.  The claimant has the following severe impairments: chronic pain, fibromyalgia, degenerative joint disease of the knees, degenerative joint disease of the spine with radiculopathy, obesity and depression.   (20 CFR 404.1520(c)). . . .

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526). . . .

5.  . . . [T]he claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) with the following specific restrictions:  she is able to lift up to 20 pounds occasionally and 10 pounds frequently; she can be on her feet up to 6 hours in an 8-hour workday; she is limited to no more than occasional overhead tasks or postural motions (like bending, twisting); the claimant is limited to simple instructions and brief/superficial contacts with others in the work setting; she is limited to 3-4 step, simple, routine, repetitive work with concrete/tangible tasks. . . .

6.  The claimant is unable to perform any past relevant work (20 CFR 404.1565). . . .

7.  The claimant was born on February 13, 1960, and was 46 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date.   The claimant subsequently changed age category to closely approaching advanced age. (20 CFR 404.1563).

8.  The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9.  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569(a)). . . .

11. The claimant has not been under a disability, as defined in the Social Security Act, from April 1, 2006, through the date of this decision (20 CFR 404.1520(g)).

(Tr. 11-24.)

The ALJ discussed Hayek's narcotic overdoses at steps two and three of the disability evaluation process.  At step two, the ALJ noted Hayek was hospitalized on several occasions during the applicable time period for breathing difficulties due to narcotic overdose.  (Tr. 12.)  The ALJ stated "the claimant has insisted these were not intentional overdoses related to mental health symptoms, but were simply mistakes in an effort to control pain."  (*Id.*)  The ALJ addressed Hayek's narcotic overdoses again at step three, in the context of whether her narcotic overdoses were episodes of decompensation related to her depression.  (Tr. 15.)  The ALJ stated, "there is no indication these were not accidental overdoses in the attempt to control pain, and the claimant has indicated they were such."[14]  (*Id.*)

In reaching his RFC determination, the ALJ discounted Dr. Radovsky's opinion as inconsistent with the weight of the objective findings because there was little evidence in physical examinations that Hayek had difficulty standing, walking or lifting.  (Tr. 22.)  Dr. Radovsky's treatment records of Hayek did not contain the type of findings

---

[14] Presumably, because the ALJ credited Hayek's statement that she accidently overdoses in an effort to control her pain, the ALJ did not address Hayek's narcotic overdoses in terms of whether the evidence supported a finding of substance addiction disorders.  Under the Social Security Disability regulations, substance addiction disorders are behavioral changes or physical changes associated with the regular use of substances that affect the central nervous system.  20 C.F.R. 404, Subpart P, Appendix 1, § 12.09.

23

one would expect if Hayek were disabled.  (*Id.*)  Additionally, her treating relationship with Hayek was brief.  (*Id.*)  The ALJ concluded Dr. Radovsky uncritically accepted Hayek's subjective complaints.  (*Id.*)  The ALJ noted Dr. Radovsky might have expressed her opinion out of sympathy to Hayek, or Hayek might have demanded a supporting opinion, which is more likely when the opinion departs substantially from the evidence in the record.  (*Id.*)

The ALJ gave Dr. Steiner's opinion great probative weight because he reviewed all the records, he heard the testimony, he is familiar with the disability regulations, he is a specialist in physical medicine and rehabilitation, and his opinion is consistent with the "weight of the objective findings."  (Tr. 17-18.)  The ALJ explained that the examination notes contained little evidence of difficulty with ambulation and use of extremities.  (Tr. 18.)  Neurological examinations were unremarkable.  (*Id.*)  Some of Hayek's pain was likely related to inactivity.  (*Id.*)  In the emergency room in January 2008, Hayek had no tenderness upon musculoskeletal examination.  (*Id.*)  Records indicate great improvement of pain with the spinal injections and nerve blocks prescribed by Dr. Roushdy.  (Tr. 18-19.)  In February 2011, Hayek's back was only mildly diffusely tender. (Tr. 19.)

The ALJ found further mental restrictions were not required because mental status examinations were generally unremarkable.  (Tr. 19.)  Hayek's mood was stable when she was hospitalized in April 2008.  (*Id.*)  Winkler described Hayek's mood as euthymic and her affect as normal.  (*Id.*)  The ALJ found Hayek's subjective complaints of pain were not credible because they were unsupported by objective findings.  (*Id.*) Her treatment was essentially routine and conservative in nature.  (*Id.*)  She had not

received ongoing treatment from a mental health practitioner.  (Tr. 20.) The ALJ stated, "[u]ltimately, Dr. Steiner testified the objective findings regarding the claimant's various complaints have been quite minimal compared with her allegations."  (*Id.*)

The ALJ found that Hayek did not follow up with all recommended treatment. (*Id.*)  In 2006, Dr. Morales recommended pool therapy and physical therapy, which Hayek only completed a portion of in late 2006.  (*Id.*)  In November 2008, Hayek was treated at the Midway Pain Clinic and told to follow up, but she did not.  (*Id.*)  Winkler, Hayek's most recent pain management provider, noted that she had no physical disability, and her activities of daily living were normal.  (*Id.*)  The ALJ also found there were significant periods of time when Hayek did not take any medications.  (*Id.*)  The ALJ found no evidence in the record supporting Hayek's claim of medication side effects; she never complained to providers or requested a change in medication.  (*Id.*)

Certain of Hayek's abilities supported the RFC finding, according to the ALJ. (*Id.*)  In July 2006, she walked her dog twice a day.  (*Id.*)  In October 2006, she said she enjoyed riding a bike.  (*Id.*)  In February 2008, she walked five blocks, twice a day.  (*Id.*) The ALJ found two factors weighed heavily against Hayek's testimony of her limited activities.  (Tr. 21.)  First, daily activities cannot be objectively verified.  (*Id.*)  Second, it was difficult to attribute her alleged limitations in activities to her medical condition due to her "relatively weak" medical evidence and "other factors."  (*Id.*)  The ALJ also gave some slight weight to the fact that Hayek did not appear to be in pain or discomfort at the hearing.  (*Id.*)

Then, the ALJ looked at Hayek's work history, noting she left her last job due to seasonal layoff, and he found her condition did not significantly deteriorate since then.

(*Id.*)  Hayek looked for work several months after her layoff, causing the ALJ to infer she could have worked.  (*Id.*)  Hayek told Dr. Espeland that she was doing computer work 20-30 hours per week in September 2006.  (*Id.*)  In October 2006, Hayek said she hoped to return to her seasonal job the next month.  (*Id.*)  The ALJ noted this work activity did not disqualify Hayek from disability, but it did suggest her daily activities were sometimes greater than she indicated.  (*Id.*)  The ALJ also discounted Hayek's credibility because her employment was sporadic before her alleged onset date.  (*Id.*)  The ALJ rejected Hayek's husband's testimony because he stands to gain financially from her disability, and his testimony was not consistent with the weight of the evidence. (Tr. 17.)

## II.    DISCUSSION

### A.    Standard of Review

Review by this Court is limited to a determination of whether the decision of the ALJ is supported by substantial evidence on the record as a whole.  42 U.S.C. § 405(g); *Murphy v. Sullivan*, 953 F.2d 383, 384 (8th Cir. 1992).  "The substantial evidence test employed in reviewing administrative findings is more than a mere search of the record for evidence supporting the [Commissioner's] findings."  *Gavin v. Heckler*, 811 F.2d 1195, 1199 (8th Cir. 1987).  "Substantial evidence on the record as a whole . . . requires a more scrutinizing analysis."  *Id.* (internal quotation marks omitted).  In reviewing the record for substantial evidence, the Court may not substitute its own judgment or findings of fact.  *Woolf v. Shalala*, 3 F.3d 1210, 1213 (8th Cir. 1993).  Yet, the Court must consider evidence supporting and detracting from the Commissioner's decision. *Karlix v. Barnhart*, 457 F.3d 742, 746 (8th Cir. 2006).

To be entitled to DIB, a claimant must be disabled as defined in the Social Security Act.  42 U.S.C. § 423(a)(E).  A "disability" is an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months."  *Id.* § 423(d)(1)(A); *see also* 20 C.F.R. § 404.1505.  The Social Security Administration adopted a five-step procedure for determining whether a claimant is "disabled" within the meaning of the Social Security Act.  20 C.F.R. § 404.1520(a)(4).  The five steps are (1) whether the claimant is engaged in any substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the impairment meets or medically equals an impairment listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1; (4) whether the claimant can return to his or her past relevant work; and (5) whether the claimant can adjust to other work in the national economy.  *Id.* § 404.1520(a)(4)(i-v).  The claimant has the burden of proof to show he or she is disabled through step four; at step five, the burden shifts to the Commissioner.  *Snead v. Barnhart*, 360 F.3d 834, 836 (8th Cir. 2004); *see also* 20 C.F.R. § 404.1512(a); *Thomas v. Sullivan*, 928 F.2d 255, 260 (8th Cir. 1991).

### B.    Issues

Hayek raises two arguments in support of her motion for summary judgment, both of which concern the treatment of medical opinions by the ALJ in determining Hayek's RFC.

At steps four and five of the disability evaluation, the ALJ assesses the claimant's RFC.  20 C.F.R. § 404.1520(a)(4)(iv-v).  "RFC is defined as the most a claimant can still do despite his or her physical or mental limitations."  *Martise v. Astrue*, 641 F.3d 909,

923 (8th Cir. 2011). "RFC is a medical question, and an ALJ's finding must be supported by some medical evidence. . . . The ALJ, however, still bears the primary responsibility for assessing a [claimant's RFC] based on all relevant evidence." *Guilliams v. Barnhart*, 393 F.3d 798, 803 (8th Cir. 2005) (citations and quotation omitted). The ALJ considers all of the medical opinions from treating and nontreating sources, 20 C.F.R. § 404.1527(c), and an "ALJ must resolve conflicts among the various opinions." *Heino v. Astrue*, 578 F.3d 873, 879 (8th Cir. 2009).

Credibility of subjective complaints is another factor in the ALJ's RFC determination. 20 C.F.R. § 404.1545(e); 20 C.F.R. § 404.1529(c)(3). In evaluating a claimant's subjective complaints, the ALJ cannot rely solely on the lack of objective medical evidence, and the ALJ must consider: 1) the claimant's daily activities; 2) the duration, frequency and intensity of pain or other subjective complaint; 3) precipitating and aggravating factors; 4) dosage, effectiveness and side effects of medication; 5) functional restrictions; and 6) work history. *Polaski v. Heckler*, 739 F.3d 1320, 1322 (8th Cir. 1984); *see also Ford*, 518 F.3d at 982 (applying *Polaski*). If an ALJ gives good reasons for discrediting a claimant's testimony, courts should defer to the ALJ's judgment. *Dunahoo v. Apfel*, 241 F.3d 1033, 1038 (8th Cir. 2001).

Hayek first argues that the ALJ misunderstood the nature of fibromyalgia, which caused him both to place significant weight on the flawed testimony of Dr. Steiner and reject the opinion of Dr. Radovsky, Hayek's treating physician. Hayek contends that the ALJ misunderstood fibromyalgia because he discounted Dr. Radovsky's opinion based on the lack of objective findings when the record, in fact, contained findings of positive fibromyalgia trigger points. Hayek asserts that fibromyalgia may be disabling, and the

ALJ never identified what objective evidence was lacking to support Dr. Radovsky's opinion, given that fibromyalgia is a rheumatologic, not a neurological or orthopedic, disease.

Hayek also contends the ALJ erred by crediting Dr. Steiner's opinion because Dr. Steiner did not properly evaluate her fibromyalgia, but instead discounted her pain because "there are diffuse pain reports without much in the objective sphere." (Mem. in Supp. of Pl's Mot. for Summ. J. ("Pl's Mem.") at 26 (quoting Tr. 74).)   Additionally, Hayek asserts error in crediting Dr. Steiner's testimony when he never examined Hayek, and discounting Dr. Radovsky's opinion because she only saw Hayek five times. Hayek points out that Dr. Radovsky referred her to other providers and reviewed the other providers' treatment records.  Thus, Hayek concludes the ALJ did not give good reasons for rejecting Dr. Radovsky's opinion.[15]

Further, Hayek argues that the medical records support Dr. Radovsky's opinion of disabling limitations.  Hayek notes that she has consistently tried many treatment modalities and different medications for fibromyalgia; she was not a surgical candidate due to the absence of nerve root impingement; and, even with narcotic pain medication, she sometimes suffered extreme pain.  Because Dr. Radovsky said she had reached the boundaries of what conventional medicine could do for Hayek's pain, Hayek argues that her treatment has been neither routine nor conservative, and her pain remains uncontrolled.

The Commissioner disputes Hayek's contention that the ALJ failed to identify objective medical findings that were inconsistent with Dr. Radovsky's opinion, referring

---

[15] Hayek does not challenge the ALJ's evaluation of Dr. Karayusuf's mental RFC opinion, and the Court will not address it.

to the ALJ's conclusion that "[Dr. Radovsky's] limitations [were] not consistent with the weight of the objective medical findings *throughout the applicable time period and discussed in detail above, which establish[ed] few physical difficulties regarding [Plaintiff's] abilities to stand, walk, and lift, on physical examinations.*"   (Def's Mem. in Supp. of Mot. for Summ. J. ("Def's Mem.") at 9 (quoting Tr. 22) (emphasis in original).).   The Commissioner also disputes Hayek's contention that positive trigger-point findings on examination support Dr. Radovsky's opinion regarding Hayek's limitations because the trigger-point findings only established the diagnosis of fibromyalgia, not the severity of the condition.   The Commissioner asserts it was appropriate for the ALJ to rely on objective evidence to refute Dr. Radovsky's opinion of Hayek's ability to perform tasks such as walk, stand and lift.

The Commissioner further contends it was appropriate for the ALJ to discount Dr. Radovsky's opinion because she only saw Hayek about once per year during the relevant time period.   The Commissioner notes that Hayek saw Winkler many more times and he opined that Hayek had no physical disabilities.   Moreover, the Commissioner asserts that the ALJ properly rejected Dr. Radovsky's opinion because it was based solely on Hayek's subjective complaints, which were inconsistent with medical records indicating that Hayek performed normal activities of daily living; she sometimes failed to follow treatment recommendations; she left work for reasons unrelated to her medical conditions; she worked after her onset date; she had a sporadic work history; her pain improved with treatment; and her treatment was routine and conservative in nature.   In contrast to the opinion of Dr. Radovsky, the Commissioner argues that Dr. Steiner's opinion both reflects Hayek's fibromyalgia

diagnosis and takes into account these inconsistencies in the record when opining how Hayek's fibromyalgia affected her ability to work.

In reply, Hayek asserts her treatment, while conservative only to the extent that she did not require surgery, was not routine.  She tried many forms of treatment, different programs, and medications.  Furthermore, Hayek argues Dr. Radovsky's relationship with her "exemplifies the rationale for the treating physician rule" that Dr. Radovsky is especially qualified to provide a conclusion regarding Hayek's functional capacity.  (Mem. in Supp. of Pl's Resistance to the Comm'r's Mot. for Summ. J. at 3-4.)  Hayek asserts objective evidence supported Dr. Radovsky's opinion because her gait was frequently abnormal and straight-leg-raise testing only predicts disc herniation, not the ability to walk.  As for Winkler's treatment notes that Hayek had no physical disability, Hayek contends this is contrary to the weight of evidence in the record and the fact that Winkler prescribed oxycodone and OxyContin to treat her pain.  Hayek also asserts her daily activities during the relevant time period were limited and the ALJ relied on evidence of daily activities prior to her alleged onset date.  Finally, Hayek contends Dr. Steiner's opinion is not entitled to significant weight because the opinion is conclusory and not supported by better or more thorough evidence than Dr. Radovsky's opinion.

### 1.  Treating Physician Opinion & Subjective Pain Complaints

The Court begins with Hayek's assertion that her fibromyalgia diagnosis was misunderstood.  The record reveals that Dr. Steiner, whose opinion the ALJ accorded "great probative weight," recognized Hayek's diagnosis of fibromyalgia, and that fibromyalgia is a disorder with symptoms of muscle pain, chronic fatigue and other

symptoms that cannot be objectively verified.  *See Kelley v. Callahan*, 133 F.3d 583, 589 (8th Cir. 1998) ("Fibromyalgia, which is pain in the fibrous connective tissue components of muscles, tendons, ligaments and other white connective tissues, can be disabling."); *see also Pirtle v. Astrue*, 479 F.3d 931, 935 (8th Cir. 2007) ("Fibromyalgia is a chronic condition which is difficult to diagnose and may be disabling.").  Indeed, the ALJ concluded that Hayek's fibromyalgia was a severe impairment.  But RFC is "an assessment of what [Hayek] can and cannot do, not what [s]he does and does not suffer from."  *Mitchell v. Astrue*, 256 Fed. App'x 770, 772 (6th Cir. 2007); *accord Martise*, 641 F.3d at 923.  Here, the ALJ did not discount Hayek's *diagnosis* of fibromyalgia based on lack of objective findings; he discounted Dr. Radovsky's opinion regarding the *severity of Hayek's work-related limitations* and Hayek's subjective complaints.

According to the ALJ, Dr. Radovsky's opinion reflected Hayek's work-related limitations only if Hayek's subjective complaints were fully credited.  Based on this reasoning, the ALJ properly discounted Dr. Radovsky's opinion if (1) there were good reasons for discounting Hayek's subjective complaints of pain and (2) Dr. Radovsky's opinion was inconsistent with her own treatment records or contrary to the medical evidence as a whole.  *See Renstrom v. Astrue*, 680 F.3d 1057, 1064-65 (8th Cir. 2012) (finding ALJ properly gave non-controlling weight to treating physician's opinion because it was largely based on subjective complaints, the opinion was contradicted by other objective evidence in the record, and the ALJ discredited the claimant's credibility in a detailed discussion, finding inconsistencies in the record as a whole were inconsistent with the claimant's allegations).  This Court concludes, however, that the

ALJ's analysis of these two items (which are often interrelated in the present case) is troublesome in several respects.

First, the objective findings cited by the ALJ (and relied upon by the Commissioner) to discount Dr. Radovsky's opinion provide little insight into Hayek's ability to perform work-related activities, such as standing, walking and lifting.  The Commissioner cited the following objective findings in support of the ALJ's conclusion that Hayek's standing, walking and lifting limitations were not as great as Dr. Radovsky opined: mostly mild degenerative arthritis of the knees, cervical, thoracic, and lumbar spine; normal neurological examinations; evidence of deconditioning as the potential cause for some limited range of motion and gait disturbance; limited findings of muscle spasm; and normal strength of the extremities.  But such findings offer little support in terms of how long Hayek could sit, stand, walk, lift or engage in physical work activity given her fibromyalgia pain.  *See Forehand v. Barnhart*, 364 F.3d 984, 988 (8th Cir. 2004) ("We have stated that to determine whether a claimant has the residual functional capacity necessary to be able to work we look to whether she has the ability to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world." (quotation omitted)).  Nor do they preclude the possibility that Hayek suffered severe flares of pain due to her fibromyalgia.

Second, the ALJ's rationale for discounting Dr. Radovsky's opinion was insufficient in light of the controlling weight opinions of treating sources are generally given.  *See* 20 C.F.R. § 404.1527(c)(2); *Owen v. Astrue*, 551 F.3d 792, 798 (8th Cir. 2008) ("Typically, medical opinions from treating sources are entitled to greater weight

than are medical opinions from consultative sources."). While the ALJ discounted Dr. Radovsky's opinion because her treating relationship was brief, the record supports Hayek's contention that Dr. Radovsky was more involved in Hayek's care than represented in the number of appointments. For each referral Dr. Radovsky gave Hayek from October 2005 through May 2008, Dr. Radovsky received information from those providers on their findings and treatment recommendations. The nature of Dr. Radovsky's treating relationship with Hayek deserves some credit in weighing her opinion, especially given Dr. Steiner's lack of any relationship with Hayek. *See* 20 C.F.R. § 404.1527(c)(1), (2) (giving more weight to medical opinions in which the source examined and treated the claimant).

Additionally, the Eighth Circuit has criticized the discounting of medical opinions based on a lack of findings in the record of the type one would expect if the claimant were disabled when the ALJ fails to explain the type of findings to be expected. *See Willcockson v. Astrue*, 540 F.3d 878, 881 (8th Cir. 2008) (finding ALJ's conclusion that the severity of the claimant's symptoms was disproportionate to the 'usual expected severity of her condition' was a medical conclusion, unsupported by evidence of what symptoms were usual or typical for the claimant's impairments). The ALJ employed this type of reasoning when giving less weight to Dr. Radovsky's opinion without discussing what findings were missing.

Third, the evidence in the record cited by the ALJ regarding Hayek's abilities, which was derived from Hayek's engaging in certain activities, is inconsistent with the ALJ's RFC determination. In support of his determination that Hayek was able to perform light work, the ALJ noted: in July 2006, Hayek walked her dog twice a day; in

34

October 2006, she said she enjoyed riding a bike; and, in February 2008, she walked five blocks twice a day. At the recommendation of her doctors to get more exercise, for a period of time, Hayek walked 45 to 60 minutes a day. But Hayek also testified that she avoided climbing the stairs in her own home and spent most of the day lying down. Her other daily activities were likewise quite limited, cooking primarily in the microwave and assisting her husband with light housekeeping. "In evaluating a claimant's RFC, consideration should be given to the quality of daily activities and the ability to sustain activities, interests, and relate to others over a period of time . . . ." *Leckenby v. Astrue*, 487 F.3d 626, 633-34 (8th Cir. 2007) (quotation omitted). Hayek's daily activities do not provide substantial evidence supporting the ALJ's RFC finding.

In addition, Winkler's statement concerning Hayek's apparent lack of disability and normalcy in her daily activities is rather suspect. Although the statement of no physical disability and normal activities of daily living appears frequently in the "Social History" section of Winkler's treatment records, the statement was inconsistent with Hayek's complaints to Winkler. Because the statement was internally inconsistent with the treatment records and unexplained, the extent to which the ALJ used it to discount Dr. Radovsky's opinion and Hayek's credibility is also suspect. *See Pirtle*, 479 F.3d at 935 ("When a treating physician's record includes inconsistencies, his own inconsistency may undermine or diminish the weight afforded to his opinion.").

Fourth, in discounting Hayek's subjective complaints of pain, the ALJ overstated the pain relief Hayek received from spinal injections and nerve blocks and minimized the panoply of treatment modalities Hayek underwent, which ultimately left her pain uncontrolled. Despite a nerve block in October 2010, Hayek's pain remained

uncontrolled the following month and she told Winkler that her long acting pain medication was not lasting long enough.  In the months following another nerve block in December 2010, Hayek was in too much pain to raise her arms and her pain was still uncontrolled.   Even though there is evidence of some improvement from various treatments at times, the record indicates overall that Hayek continued to complain of significant pain.

Moreover, the ALJ's finding that Hayek's treatment was essentially routine and conservative in nature is unsupported by the record.   True, Hayek did not require surgery for degenerative arthritis, but, according to Dr. Radovsky, Hayek tried every possible treatment that conventional medicine had to offer for fibromyalgia.   Hayek tried many medications, physical therapy, comprehensive pain-management programs (including diet and exercise), injections, nerve blocks, and radiofrequency ablation.  In addition to all of these treatments, Hayek sometimes overdosed on narcotic pain medication, according to her testimony, because her pain was uncontrolled.  The record as a whole indicates Hayek's treatment was far from routine and conservative.

Fifth, the ALJ should have more fully developed the record regarding certain lapses in following treatment recommendations before using this as a basis to discredit Hayek's subjective complaints and Dr. Radovsky's opinion.   Hayek correctly contends that any instance when she did not follow a treatment recommendation before her alleged onset date does not reflect on her condition during the relevant time period.

During the relevant time period, the ALJ cited the fact that Hayek was advised to follow up at the Midway Pain Clinic in November 2008, but she did not, and there were some periods when she was not on any medication.  "[A]n individual's failure to seek

aggressive medical care militates against a finding that his symptoms are disabling."
*Moraine v. Soc. Sec. Admin.*, No. 08-cv-5982 (JRT/RLE), 695 F. Supp.2d 925, 958 (D.
Minn. 2010).   "It is for the ALJ in the first instance to determine [the claimant's]
motivation for failing to follow prescribed treatment or seek medical attention."  *Johnson
v. Bowen*, 866 F.2d 274, 275 (8th Cir. 1989).   At the hearing, Hayek's attorney
explained there were no medical records for part of 2008 and 2009 because Hayek did
not have medical insurance and could not afford treatment.   "[L]ack of financial
resources may in some cases justify the failure to seek medical attention."   *Id.*
(quotation omitted); *see also Tang v. Apfel*, 205 F.3d 1084, 1086 (8th Cir. 2000)
(claimant's "inability to afford medication cannot be used as a basis for denial of
benefits").   "[A]n ALJ must not draw any adverse inferences about a claimant's
symptoms and their functional effects from a failure to pursue regular medical treatment
without first considering whether the failure was caused by the claimant's inability to
afford treatment or obtain access to free or low-cost medical services."  *Routh v. Astrue*,
698 F. Supp.2d 1072, 1079 (E.D. Ark. 2010) (citing Soc. Sec. Rul. 96-7p, 1996
WL374186, at *7-8 (S.S.A. 1996)).   There was other evidence in the record of Hayek
reporting the inability to get certain treatment or medications because they were not
covered by insurance, and there were times when she had no insurance coverage,
which the ALJ should have addressed before inferring her reports of pain were not
credible.

Sixth, although the ALJ's analysis of Hayek's work history is supported by
substantial evidence in the record and work history can be considered in discounting a
claimant's credibility, the ALJ's credibility determination must nonetheless be based on

37

the evidence as a whole.  *See Polaski*, 739 F.2d at 1322 ("adjudicator must give full consideration to all of the evidence presented relating to subjective complaints," including prior work record).  Given the deficiencies discussed above, it is not enough that the ALJ's analysis of one of several factors and considerations is supported by substantial evidence.

### 2.  Other Medical Opinions

Hayek next contends that the regulations require the ALJ to consider all medical opinions in the record, and the ALJ never acknowledged or evaluated nurse Abruzzese's opinion that Hayek could not perform full-time work.  The Commissioner asserts that Abruzzese did not provide an opinion; rather, she only suggested that Hayek look for part-time work.  It is clear that the ALJ considered Abruzzese's treatment records because he cited directly to them.  (Tr. 18, 19, 21 (citing Exhibit 1F at 33 and 37 [Tr. 360, 364]).)  Further, while Abruzzese gave Hayek a handout about fibromyalgia and employment issues and suggested that she look for part-time work, Abruzzese did not opine Hayek was incapable of full-time work.  Abruzzese did not offer an opinion on any of Hayek's specific work-related functions or even how many hours Hayek could work in a week.  The ALJ was only required to consider Abruzzese's treatment records as part of the record as a whole.  *See Guilliams*, 393 F.3d at 801 (ALJ must take into account all relevant evidence when determining RFC).  While this Court is unpersuaded that an opinion of Abruzzese went unconsidered, the deficiencies outlined above remain regarding the ALJ's evaluation of the opinion of Dr. Radovsky and Hayek's subjective complaints of pain.

### C.      Narcotic Use

Finally, this court is also troubled by the ALJ's lack of discussion concerning Hayek's narcotic use and overdoses.   While not the focus of the parties' arguments before this Court, Hayek's pursuit of narcotic pain relievers ineluctably pervades the medical records.   The Court can draw two conclusions based on the ALJ's treatment of this issue.   First, the Court could conclude that the ALJ credited Hayek's subjective complaints of pain by finding that she overdosed on narcotics only because she could not control her pain, which she testified to at the hearing.   Such a finding, however, would have weighed in favor disability.   *See Gowell v. Apfel*, 242 F.3d 793, 797 (8th Cir. 2001) ("[T]he abuse of prescription medication may be consistent with disabling pain."). Yet, the ALJ concluded that Hayek's subjective complaints of pain were not entirely credible.

The second possibility is that the ALJ ignored or simply did not undertake the difficult analysis required by the regulations, i.e., whether substance abuse is a contributing factor material to disability.   *See* 20 C.F.R. § 404.1535(b)(1) ("The key factor we will examine in determining whether drug addiction or alcoholism is a contributing factor material to the determination of disability is whether we would still find you disabled if you stopped using drugs or alcohol.").   If a claimant is disabled when the functional limitations resulting from substance abuse (drug or alcohol addiction) are taken into account, and the ALJ cannot determine whether the claimant would be disabled if she no longer abused substances, the "tie" goes to the claimant, and disability should be awarded.   *Brueggemann v. Barnhart*, 348 F.3d 689, 693 (8th Cir. 2003) (where ALJ is unable to determine whether substance abuse is a contributing

factor material to disability, the claimant's burden has been met and benefits must be awarded).

Nowhere in the decision did the ALJ address the substance-abuse regulation. Assuming the ALJ considered the issue and found no substance abuse because Hayek did nothing more than accidently overdose in an attempt to control her pain, the ALJ should have credited Hayek's subjective complaints of pain and taken such pain into account when evaluating Dr. Radovsky's opinion.

Further, Hayek's history with narcotic pain killers also speaks to her experience with side effects of medication.  Hayek was hospitalized several times from overdoses of OxyContin, oxycodone and/or other substances.  Her husband and daughter were very concerned that she was abusing prescription medications.  Hayek's apparent dependence, and resultant overdoses, on these narcotic pain medications were side effects that affected her ability to function.  When Hayek was hospitalized on March 24, 2008, due to an overdose, the admitting physician stated, "[c]learly this patient is recurrently flirting with polypharmacy overdose which eventually will be fatal due to aspiration pneumonia or other cause unless there is intervention and reduction of her med supply from PMD and others.  Her concurrent use of ETOH is scary."  (Tr. 697.)[16] Just a few weeks later, Hayek was admitted to a hospital again for opiate overdose with acute renal failure.

In sum, this Court is unable to conclude that the ALJ's decision is supported by substantial evidence in the record as a whole given the irreconcilable nature of (1) the

---

[16] In March 2008, Hayek's husband said she stopped drinking five years ago.  (Tr. 697.)  Hayek did not report alcoholism in her medical history to most providers, although it appeared in her medical history in records before her alleged onset date.  The "Social History" sections of Dr. Britton's and Mark Winkler's treatment records indicate Hayek's alcohol use was "social."  (*See, e.g.*, Tr. 809, 891.)

reasons the ALJ provided for discounting the opinion of Hayek's treating source; (2) the

reasons the ALJ provided for discounting Hayek's subjective complaints of pain; and (3)

the absence of any analysis regarding Hayek's reliance on narcotic pain medication for

pain control.  Therefore, remand is required.

## III.   CONCLUSION

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS**

**HEREBY ORDERED THAT**:

1.   Plaintiff's motion for summary judgment (Doc. No. 15) is **GRANTED**, and pursuant to Sentence 4 of 42 U.S.C. § 405(g), the case is remanded for further proceedings consistent with this opinion;

2.   Defendant's motion for summary judgment (Doc. No. 22) is **DENIED**; and

3.   This case is dismissed.


**LET JUDGMENT BE ENTERED ACCORDINGLY.**


DATE:   September___27___, 2013

_____*s/ Tony N. Leung*_____
TONY N. LEUNG
United States Magistrate Judge


*Hayek v. Colvin*
File No. 12-cv-1986 (TNL)